IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Bryan McHowell,                                )<br>                                                        )<br>                            Plaintiff,           )<br>                                                        )<br>         vs.                                           )<br>                                                        )<br>Andrew M. Saul,                              )<br>Commissioner of Social Security,    )<br>                                                        )<br>                            Defendant.      )<br>                                                        ) | Civil Action No. 6:19-2060-RMG-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1] The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed an application for disability insurance benefits ("DIB") benefits on August 13, 2015, alleging that he became unable to work on August 1, 2013. The application was denied initially and on reconsideration by the Social Security Administration. On December 11, 2015, the plaintiff requested a hearing. A hearing before the administrative law judge ("ALJ") was held on October 2, 2017, at which the plaintiff's attorney requested that a consultative evaluation be ordered. The ALJ agreed and continued the hearing so that the plaintiff could undergo a consultative examination (Tr. 29-37). A second hearing was held before the ALJ on May 4, 2018, at which the plaintiff and

---

   [1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

James Miller, an impartial vocational expert, appeared (Tr. 38-63). The ALJ considered the case *de novo*, and on June 26, 2018, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 15-23). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on June 10, 2019 (Tr. 1-5). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.
>
> (2) The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2013, through his date last insured of December 31, 2016 (20 C.F.R. § 404.1571 *et seq*.).
>
> (3) Through the date last insured, the claimant had the following severe impairments: osteoarthritis in the left shoulder, status post multiple shoulder surgeries, and neuropathy (20 C.F.R. § 404.1520(c)).
>
> (4) Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).
>
> (5) After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except he can occasionally climb ladders. The claimant can frequently, but not constantly, reach overhead with the left upper extremity.
>
> (6) Through the date last insured, the claimant was capable of performing past relevant work as a truck driver and route sales driver. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

> (7) The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2013, the alleged onset date, through December 31, 2016, the date last insured (20 C.F.R. § 404.1520(f)).

## APPLICABLE LAW

Under 42 U.S.C. § 423(d)(1)(A), (d)(5), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 55 years old on his alleged disability onset date (August 1, 2013) and 59 years old on his date last insured (December 31, 2016) (Tr. 189). He has a high school education and past relevant work as a truck driver and route sales driver (Tr. 22, 247).

The plaintiff had a partial rotator cuff tear in his left shoulder for which he underwent a successful arthroscopic procedure in 2011 (Tr. 513). In March 2012, the plaintiff was involved in a motor vehicle accident and injured his left shoulder (Tr. 363).

On October 3, 2013, William L. Lehman, Jr., M.D., evaluated the plaintiff for left shoulder pain. The plaintiff stated that he hurt his left shoulder in a motor vehicle accident while at work, but his worker's compensation claim was denied. He reported numbness, tingling, and radiation down his arm and indicated that previous injections and physical therapy had only helped a little. A 2012 MRI showed partial thickness tears of the infraspinatus and supraspinatus, as well as an irregularity of the anterior labrum and degenerative changes of the glenohumeral joint. On examination, the plaintiff had

4

tenderness of the paracervicals, the sternocleidomastoid, and the trapezius as well as trapezius trigger point pain. His range of motion was limited, and he had positive Spurling's and O'Brien's tests and 4/5 strength on the left and 5/5 on the right. Dr. Lehman recommended surgery (Tr. 363-64).

On October 31, 2013, the plaintiff underwent a left shoulder arthroscopy (Tr. 385-94). On November 4, 2013, he was evaluated for surgical followup. The plaintiff had swelling that was within expectations given the recent procedure, moderate tenderness, and limited active motion, which was also expected. Dr. Lehman advised limited activity, prescribed Percocet, and ordered physical therapy (Tr. 355-58).

On November 11, 2013, Frank Sharp, M.D., evaluated the plaintiff for a recheck of diabetes. Dr. Sharp reviewed and continued the plaintiff's medications (Tr. 440-43).

On December 3, 2013, Dr. Lehman evaluated the plaintiff for followup. The plaintiff reported that his shoulder was doing okay, but he still had pain. He had not heard back from physical therapy yet. Dr. Lehman found that the plaintiff had swelling, within expectations given the recent procedure; moderate tenderness; and limited active motion, as expected. The plaintiff's wound was clean and dry. Dr. Lehman prescribed physical therapy and Percocet (Tr. 351-54).

The plaintiff participated in physical therapy for his left shoulder from December 4, 2013, to February 28, 2014 (Tr. 445-66, 480-511). On December 13 and 30, 2013, his therapist recorded that the plaintiff was "getting stronger each week" and was "feeling good" (Tr. 455-57). On January 3, 2014, he reported aching in his arm (Tr. 462).

On December 23, 2013, Dr. Lehman evaluated the plaintiff, who reported that his left shoulder was better. His incision had essentially healed with no infection. On examination, the plaintiff exhibited "appropriate" range of motion and had no swelling or tenderness. He denied any numbness, weakness, or tingling. Dr. Lehman noted that the

5

plaintiff enjoyed an "excellent" recovery in physical therapy. Dr. Lehman diagnosed rotator cuff syndrome and osteoarthritis of the left acromioclavicular joint. Dr. Lehman noted that the plaintiff would require additional analgesics to permit more effective rehabilitation. Dr. Lehman removed the plaintiff's staples and stitches and applied steri-strips (Tr. 347-50). On January 2, 2014, the plaintiff stated that his function was "full" (Tr. 460). Dr. Lehman provided a work status note indicating that the plaintiff could work regular duty as of January 6, 2014, with no restrictions (Tr. 381).

On February 28, 2014, Dr. Lehman completed an opinion form in which he opined that the plaintiff had restrictions of limited lifting and no overhead reaching or prolonged ambulation. He also indicated that the plaintiff required further treatment including physical therapy and medications (Tr. 478-79).

On March 18, 2014, Dr. Sharp evaluated the plaintiff for followup and reviewed and adjusted the plaintiff's medications (Tr. 435-37). On April 23, 2014, Dr. Sharp performed a diabetic foot examination and advised the plaintiff on checking his blood sugar. He continued the plaintiff's medications (Tr. 432-34). On June 20, 2014, the plaintiff was seen for a diabetic recheck. Dr. Sharp diagnosed peripheral autonomic neuropathy, chronic kidney disease, anemia, diabetes mellitus, hypertension, gastroesophageal reflux disease ("GERD"), and depression. Dr. Sharp started the plaintiff on Celebrex and continued his other medications (Tr. 429-31).

On August 5, 2014, Dr. Lehman evaluated the plaintiff for left shoulder followup. The plaintiff reported that his persistent pain often woke him up at night. He reported having physical therapy and doing exercise post surgery with little improvement. On examination, the plaintiff had tenderness of the paracervicals, sternocleidomastoid, and trapezius as well as trapezius trigger point pain. His range of motion was limited, and he had positive Spurling's and O'Brien's tests. He had 4/5 strength on the left and 5/5 on the right. Dr. Lehman prescribed Percocet and ordered an MRI arthrogram "to determine the

source of ongoing symptoms and continued functional disability" (Tr. 343-46). On August 19, 2014, the MRI left shoulder arthrogram showed post-surgical changes with no evidence of rotator cuff tear, mild tendinopathy of the supraspinatus and tinnitus tendons, and blunting of the anterior labrum, which may have been post-surgical (Tr. 371).

On August 22, 2014, Dr. Lehman wrote a letter to a paralegal at the law office representing the plaintiff. In the letter, Dr. Lehman noted the plaintiff's preexisting partial rotator cuff tear at the left shoulder, which required an arthroscopic procedure in 2011. Dr. Lehman further noted the plaintiff's work-related incident in March 2012, in which he suffered a complete rotator cuff tear with impingement as well as intraarticular derangement for which he underwent surgery on October 31, 2013. Dr. Lehman stated that the plaintiff "was doing quite well" after his surgery. However, Dr. Lehman opined that the plaintiff would not be able to return to his previous job due to the substantial repetitive physical demands on both of his shoulders (Tr. 513-14).

On August 28, 2014, Dr. Lehman evaluated the plaintiff for followup. On examination, the plaintiff had tenderness of the paracervicals, sternocleidomastoid, and trapezius as well as trapezius trigger point pain. His range of motion was limited. The plaintiff's motor strength in his neck was difficult to assess due to pain and spasm. His strength was 5/5. Dr. Lehman also found a positive Spurling's test. The plaintiff had no atrophy, erythema, or swelling; normal motor strength, sensations, and reflexes; and appeared to be healthy and in no acute distress. Dr. Lehman noted that arthrograms of the plaintiff's left shoulder were "relatively normal." An MRI showed post-surgical changes with no evidence of rotator cuff tear and mild tendinopathy of the supraspinatus and infraspinatus tendon with blunting of the anterior labrum, which may have been post-surgical. Dr. Lehman diagnosed rotator cuff syndrome, osteoarthritis of the acromioclavicular joint, glenoid labrum tear, supraspinatus tendinitis, and numbness. He ordered EMG testing and recommended home exercises (Tr. 339-42).

7

On September 9, 2014, Dr. Sharp evaluated the plaintiff for a recheck of his chronic conditions. Dr. Sharp discussed diet and exercise and continued the plaintiff's medications. Dr. Sharp also indicated that the plaintiff would be given a disabled placard for his peripheral autonomic neuropathy (Tr. 424-28).

On September 17, 2014, Allan S. Ryder-Cook, M.D., evaluated the plaintiff for left shoulder and arm pain and numbness. The plaintiff reported continuing pain in his left shoulder with some pain radiating down his arm as well as numbness in his whole arm at times, particularly with any repetitive use of the arm. He also had numbness when he was doing things such as watching television. Dr. Ryder-Cook noted that the plaintiff had previously undergone bilateral carpal tunnel release. The plaintiff's motor, sensory, and reflexes examinations were normal. Nerve conduction studies performed that day showed moderate bilateral carpal tunnel syndrome, and Dr. Ryder-Cook indicated that he felt some of the plaintiff's symptoms in the left hand were related to this. Dr. Ryder-Cook also noted that the studies showed some slowing of the left ulnar nerve and slight drop of the elbow, which might also contribute to the symptoms in the plaintiff's left hand, although he felt the majority of the plaintiff's symptoms were related to his shoulder problem (Tr. 522-31).

On September 30, 2014, Dr. Lehman evaluated the plaintiff, who reported persistent left shoulder pain and numbness. On examination, the plaintiff had tenderness of the paracervicals, sternocleidomastoid, and trapezius as well as trapezius trigger point pain. His range of motion was limited. The plaintiff's motor strength in his neck was difficult to assess due to pain and spasm, and his strength was 5/5. Dr. Lehman also found a positive Spurling's test. The plaintiff had no atrophy, erythema, or swelling. Dr. Lehman noted that arthrogram of the plaintiff's left shoulder was "relatively normal." He assessed the plaintiff with mild tendinopathy of the supraspinatus and infraspinatus tendon with blunting of the anterior labrum. Dr. Lehman referred the plaintiff to Matthew Schwartz, M.D., and recommended the plaintiff be on a home, physician-directed exercise program.

Dr. Lehman also recommended anti-inflammatory medication and steroid injections (Tr. 335-38).

On October 14, 2014, Dr. Schwartz evaluated the plaintiff for left shoulder pain at Dr. Lehman's request. On examination, the plaintiff had normal cervical range of motion. His left shoulder range of motion was limited secondary to pain with forward elevation. The plaintiff's left Hawken's test was positive. His left strength had abduction of 4/5, flexion of 4/5, and external rotation at zero degrees, abduction 4/5, and internal rotation 5/5. The plaintiff had no atrophy, erythema, or swelling; normal motor strength, sensations, and reflexes; and appeared to be healthy and in no acute distress. Dr. Schwartz reviewed an x-ray of the plaintiff's shoulder and reported that it was "unremarkable," showing only mild degenerative changes. Dr. Schwartz administered a left shoulder cortisone injection (Tr. 331-34).

On October 29, 2014, Dr. Sharp evaluated the plaintiff for a Department of Transportation physical (Tr. 421-22).

On November 26, 2014, Dr. Schwartz completed a medical questionnaire regarding the plaintiff. Dr. Schwartz indicated that he reviewed Dr. Lehman's reports from July 6 and August 22, 2014, and that he concurred with Dr. Lehman's diagnosis and assessment of the plaintiff's injuries and future medical treatment. Dr. Schwartz indicated that his opinions were "stated most probably and to a reasonable degree of medical certainty" (Tr. 532).

On December 18, 2014, Gisele Girault, M.D., evaluated the plaintiff for left shoulder pain. The plaintiff reported that his pain had been gradually worsening and continuous since 2013. He described his pain as aching, burning, shooting, and throbbing. The plaintiff rated his pain at ten out of ten. He reported that his pain was aggravated by any physical activity and that there were no alleviating factors. Dr. Girault obtained baseline toxicology testing and prescribed tramadol and Voltaren (Tr. 533-41).

On December 22, 2014, Dr. Schwartz evaluated the plaintiff for a recheck of his left shoulder. Dr. Schwartz noted that the plaintiff had some mild to moderate degenerative change in his shoulder, and he did not think the plaintiff was an appropriate candidate for shoulder replacement surgery at that time. Dr. Schwartz also saw no evidence that would require shoulder arthroscopy. If the plaintiff failed to improve, Dr. Schwartz stated that he would consider diagnostic arthroscopy and possible debridement, but he did not think the plaintiff "is ready for shoulder replacement." Dr. Schwartz administered a left shoulder injection (Tr. 328-30).

On January 9, 2015, Dr. Girault reevaluated the plaintiff. The plaintiff rated his pain at eight out of ten. On examination, he had moderate tenderness over the anterolateral border of the acromion and limited range of motion due to pain. Dr. Girault noted that the plaintiff's surgeon was giving him shoulder injections, which she recommended continuing. Dr. Girault increased tramadol and continued Voltaren (Tr. 542-44).

On January 13, 2015, Dr. Sharp evaluated the plaintiff for followup of his multiple chronic conditions. Dr. Sharp reviewed the plaintiff's blood sugar logs and continued his medications (Tr. 415-19).

On February 6, 2015, Dr. Girault evaluated the plaintiff for followup. The plaintiff rated his pain at eight out of ten. He indicated that physical activity aggravated his pain and that rest, medication, and activity modification relieved the pain. On examination, the plaintiff had moderate tenderness over the anterolateral border of the left acromion and limited range of motion testing due to pain. Dr. Girault continued tramadol and restarted Voltaren (Tr. 547-49). On March 6, 2015, at a followup, the plaintiff continued to report eight out of ten pain in his left shoulder. The plaintiff's urine drug screen was appropriate. On examination, the plaintiff had moderate tenderness over the anterolateral border of the left acromion and limited range of motion testing due to pain. Dr. Girault continued his

medications and noted that there was nothing more she could offer since he was already receiving injections from his surgeon (Tr. 554-56).

On June 8, 2015, Dr. Lehman evaluated the plaintiff for a recheck. The plaintiff reported continued left shoulder pain. Dr. Lehman noted the two steroid injections that Dr. Schwartz had given the plaintiff and referred him to pain management. The plaintiff also discussed shoulder surgery but wanted to put it off as long as possible. On examination, the plaintiff had tenderness of the paracervicals, sternocleidomastoid, and trapezius as well as trapezius trigger point pain. His active range of motion was flexion to 45 degrees, extension to 25 degrees, rotation to the left of 60 degrees, and pain elicited by motion. The plaintiff's passive range of motion was slightly limited by pain and spasm. Motor strength in his neck was difficult to assess due to pain and spasm. His strength was 5/5. Dr. Lehman also found a positive Spurling's test. The plaintiff had no atrophy, erythema, or swelling; normal sensations and reflexes; and appeared to be healthy and in no acute distress. Dr. Lehman diagnosed status post work injury from March 12, 2012, residual left shoulder pain with underlying mild tendinopathy of the supraspinatus and infraspinatus tendon with blunting of the anterior labrum. Other diagnoses included bilateral moderate carpal tunnel syndrome, left greater than right with evidence of slowing of the left ulnar nerve and slight drop at the elbow, and chronic pain syndrome. Dr. Lehman noted that the plaintiff could eventually require a left shoulder replacement and stated that the plaintiff had permanent restrictions of lifting no more than ten pounds with the left arm and no overhead activities. He also noted that the plaintiff might be a candidate for Social Security disability due to his residual loss of function with the left arm, bilateral moderate carpal tunnel syndrome, as well as ulnar neuropathy, and the lack of transferrable skills. Dr. Lehman indicated that the plaintiff appeared to have reached maximum medical improvement since there was no further intervention that would reliably lessen the current level of disability. He opined that the plaintiff suffered a 12% impairment involving the left

shoulder and a 3% upper extremity impairment, combining to equal a 16% impairment of the left upper extremity (Tr. 324-27). Dr. Lehman also provided a work status note restricting the plaintiff to light duty with limitations of no lifting and carrying over ten pounds and no overhead work (Tr. 380).

In a mobility questionnaire dated August 8, 2015, the plaintiff indicated that he drove, did laundry, performed household chores, cooked, shopped in stores and on the computer, went outside daily, took care of animals, paid bills, and dressed himself. He went to church every week and regularly went out to stores. To relax, the plaintiff watched television, read, and listened to music (Tr. 270-76).

On August 24, 2015, Dr. Sharp completed a mental questionnaire regarding the plaintiff at the Commissioner's request. Dr. Sharp indicated that the plaintiff suffered from depression and was treated with amitriptyline. Medication had helped the plaintiff's condition, and psychiatric care was not recommended. On examination, the plaintiff was appropriately oriented with an intact thought process, appropriate thought content, normal mood and affect, and good attention, concentration, and memory. The plaintiff had good ability to complete basic activities of daily living, to relate to others, to complete simple routine tasks, and to complete complex tasks, and he was capable of managing his own funds (Tr. 406).

On September 1, 2015, Dr. Sharp evaluated the plaintiff for a recheck of shoulder pain, peripheral neuropathy, and insomnia. On examination of his shoulder, the plaintiff exhibited no swelling, had no pain, and had full range of motion. The plaintiff was given a quad cane and was to continue taking medication for his shoulder pain (Tr. 403-05).

In September and December 2015, four state agency medical consultants reviewed the plaintiff's medical records to assess whether the plaintiff's impairments were disabling on or before his date last insured. The state agency physicians found that the evidence was insufficient to support a disability determination (Tr. 74-90).

12

On October 20, 2015, Dr. Sharp completed a mental questionnaire regarding the plaintiff, giving the same answers as in the August 2015 questionnaire (Tr. 400; *see* Tr. 406). On November 30, 2015, Dr. Sharp evaluated the plaintiff for followup of his multiple chronic conditions. The plaintiff's medications were reviewed and continued (Tr. 570-73).

On December 3, 2015, David Robison, FNPBC, in Dr. Sharp's office evaluated the plaintiff for a Department of Transportation physical examination (Tr. 567-69). Treatment records note, "See D.O.T. Physical Form - 3 month certification due to Hypertension"(Tr. 568).

Following the first hearing, Sushill K. Das, M.D., evaluated the plaintiff at the Commissioner's request on December 1, 2017. The plaintiff reported suffering from neuropathy in his feet for over 15 years, causing him to be numb at times. He reported a left shoulder impairment and that he "hurts and aches" and could not lift heavy objects. He reported having diabetes since 2000, but he did not take any medicine, having done well following gastric bypass surgery, which resulted in substantial weight loss. Dr. Das indicated that the plaintiff was in no acute distress. He was 6'1" tall and weighed 202.8 pounds, and his blood pressure was 140/84. On examination, the plaintiff had normal range of motion in his left shoulder. He had muscle power of 5/5 bilaterally in both the upper and lower extremities and was able to climb up on and down off of the examining table without any difficulty. The plaintiff's sensation was intact for pain, touch, and temperature. Straight leg raising test, both supine and sitting position, was within normal limits. The plaintiff walked without any difficulty, and he was cooperative. He was able to spell the word "world" forward but could not do it backwards. Dr. Das stated, "Overall this gentleman has no significant positive physical findings except some restriction of the left shoulder. He will be able to do normal physical activity except heavy lifting with his left shoulder may be a problem" (Tr. 611-12). On the same date, Dr. Das completed a medical source statement, indicating that the plaintiff was able to lift and carry 21 to 50 pounds, could sit and stand for

13

eight hours each in an eight-hour workday, and could walk six hours of an eight-hour workday. The plaintiff did not need a cane to ambulate. He could frequently reach overhead with both upper extremities and could continuously reach in other directions, handle, finger, feel, push, and pull. The plaintiff could continuously use his feet for the operation of foot controls; could frequently climb ladders and scaffolds, crouch, and crawl; and could continuously climb stairs and ramps, balance, stoop, and kneel. The plaintiff could frequently be exposed to unprotected heights and could continuously be exposed to all other environmental limitations. The plaintiff could also tolerate loud noise. Dr. Das indicated that the plaintiff was able to engage in various physical activities, but he noted that heavy lifting with the left hand may be difficult (Tr. 605-10).

At the hearing on May 4, 2018, the plaintiff testified that he had difficulty reaching overhead, but could "do some reaching forward." He further testified that, due to neuropathy, he could stand no more than an hour before having to sit down and could walk about 100 yards before having to take a break. He could lift 30-50 pounds using both hands, but could not do that repeatedly throughout the day. He could lift no more than ten pounds with only his left hand. The plaintiff further testified that he did light household chores and could drive. He occupied his time by interacting with his grandchildren, watching television, and reading (Tr. 49-54). The ALJ asked the plaintiff about his physical examination on December 3, 2015, which was required by the Department of Transportation to renew his commercial driver's license (Tr. 56-57; *see* Tr. 567-58). The plaintiff testified that he "passed [the physical examination] with stipulations that my blood pressure was high, so it was only good for a month" (Tr. 57).

The vocational expert identified the plaintiff's past relevant work as a truck driver and sales route driver. (Tr. 59). The ALJ asked the vocational expert the following hypothetical:

> Assume that I find, on the basis of the credible record before me, for a full relevant period, that the claimant's demonstrated exertional impairments reflect the residual functional capacity for a full range of medium work, on a sustained basis. Assume further that he's demonstrated certain significant nonexertional impairments, principally relating to osteoarthritis of the left shoulder, multiple left shoulder surgeries, and neuropathy, which limits him to work requiring occasional climbing of ladders; frequent, but not constant overhead reaching, left upper extremity. Taking into full account these nonexertional restrictions, the claimant's age, education, and prior relevant work experience, are there jobs existing in the several regions of the country that he could do, with these limitations?

(Tr. 59-60). The vocational expert indicated that the plaintiff's past work would be available "as it's typically done, according to the [*Dictionary of Occupational Titles* ("*DOT*")]" (Tr. 60). The plaintiff's attorney asked about adding a limitation to lifting only ten pounds, and the vocational expert indicated that the past work would not be available, and no other medium work would be available. Next, the attorney asked about adding a limitation to occasional reaching in any plane with the left upper extremity. The vocational expert indicated that there would be no work available (Tr. 61). The vocational expert also indicated that there would be no past work or any other medium work available if there was an added limitation of no overhead reaching with the left upper extremity (Tr. 62).

## ANALYSIS

The plaintiff argues that the ALJ failed to properly consider the opinions of treating physicians Drs. Lehman and Schwartz (doc. 12 at 18-24). The regulations require that all medical opinions in a case be considered. 20 C.F.R. § 404.1527(b). The regulations further direct ALJs to accord controlling weight to a treating physician's opinion that is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that is not inconsistent with the other substantial evidence of record. *Id.* § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, the ALJ must proceed to weigh the treating physician's opinion, along with all the other medical opinions of record,

15

based upon the following non-exclusive list of factors: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5).[2] *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

The plaintiff argues that the ALJ failed to properly consider the following opinions by Drs. Lehman and Schwartz (doc. 12 at 18-22), which are described in greater detail above: (1) On February 28, 2014,[3] Dr. Lehman opined that the plaintiff had restrictions of limited lifting and no overhead reaching or prolonged ambulation (Tr. 478-79); (2) On August 22, 2014, Dr. Lehman stated that the plaintiff would not be able to return to his previous job due to the substantial repetitive physical demands on both of his shoulders (Tr. 513-14); (3) On November 26, 2014, Dr. Schwartz stated that he concurred with Dr. Lehman's diagnosis and assessment of the plaintiff's injuries and future medical treatment (Tr. 532); and (4) On June 8, 2015, Dr. Lehman restricted the plaintiff to light duty with limitations of no lifting and carrying over ten pounds and no overhead work (Tr. 380).

The ALJ considered the opinions and stated as follows:

> The undersigned accords partial weight to each of the offered opinions. While the opinions were offered by treating sources, they are largely unsupported. However, the claimant testified to being able to lift 30 to 50 pounds. The claimant later testified that he was prohibited from lifting over 10 pounds, but this

---

[2] These regulations apply for applications, like the plaintiff's, filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. For applications filed on or after March 27, 2017, a new regulatory framework for considering and articulating the value of medical opinions has been established. *See id.* § 404.1520c. *See also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective Mar. 27, 2017).

[3] This is the same medical source statement referred to by the ALJ as dated February **4**, 2014 (Tr. 21). The date on the statement is difficult to read (Tr. 479). However, Dr. Lehman noted in a later statement that he had completed a questionnaire about the plaintiff on February 28, 2014 (Tr. 514).

16

> appears to be an assessed limitation, not the claimant's actual level of functioning. Moreover, the remote opinions are inconsistent with the claimant's most recent treatment records that are void of ongoing complaints or documented abnormalities. The opinions are also inconsistent with the claimant's physical examination to obtain a [Department of Transportation] license and his report that the examination was unremarkable apart from his elevated hypertension.

(Tr. 21-22).

The Commissioner argues that the ALJ's evaluation of the opinions is supported by evidence cited by the ALJ earlier in the decision, showing that while the plaintiff had tenderness and decreased range of motion at times, examinations also revealed that he had no atrophy, erythema, or swelling, mostly intact muscle strength and tone, normal sensations and reflexes, and MRIs showed only mild abnormalities (doc. 13 at 12) (citing Tr. 20, 326, 337, 345, 349, 404, 405-38, 512, 523, 534).  The Commissioner further argues that the ALJ's assessment of the opinions is supported by the plaintiff's testimony regarding the amount he could lift, his daily activities, and the consultative examination by Dr. Das (doc. 13 at 12-14).

The undersigned agrees with the plaintiff that the ALJ failed to properly consider the treating physicians' opinions. The ALJ's statement that the opinions were "largely unsupported" lacks the specificity required in evaluating the weight to be given to a treating physician's opinion (doc. 12 at 22). While the Commissioner contends that particular examination and MRI findings were inconsistent with the treating physicians' opinions, the ALJ did not cite to this evidence in rejecting the opinions. Further, the Commissioner's argument that the plaintiff's daily activities were inconsistent with the treating physicians' opinions is *post-hoc* rationalization not included in the decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  Moreover, while the plaintiff did testify at the hearing that he could lift 30 to 50 pounds using both hands, he also testified

17

that he could not lift this weight repeatedly throughout the day and that he could lift no more than ten pounds with his left hand, which does not contradict the treating physicians' opinions (*see* Tr. 52-53).

Moreover, the ALJ's statement that the treating physicians' opinions were "remote" was in error (*see* Tr. 21). The relevant period for consideration here is between August 1, 2013 (the alleged onset date of disability) and December 31, 2016 (the date last insured) (doc. 12 at 23). Thus, the treating physicians provided their opinions during the relevant period, while Dr. Das' consultative examination in December 2017 was outside the relevant period (*id.*). The Commissioner argues that the ALJ's "mischaracterization" of the treating physicians' opinions as "remote" is harmless error (doc. 13 at 12 n.4). The undersigned agrees with the Commissioner's premise that medical evidence produced after the date last insured can be considered retrospectively so long as there is a linkage with the claimant's condition prior to the date last insured (doc. 13 at 13) (citing *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 338, 440-41 (4th Cir. 2012)). However, here, it appears that the ALJ did not properly consider the timing of the medical opinions in evaluating the weight to be given to them. Accordingly, the undersigned cannot say that this is harmless error.

The undersigned is particularly troubled by the ALJ's rejection of the treating physicians' opinions as to the plaintiff's overhead reaching limitations. In the discussion of the opinion evidence, the ALJ gave "partial weight" to Dr. Lehman's June 2015 opinion, finding, in part, that "[t]he record supports a finding that the claimant **cannot perform overhead reaching**" (Tr. 21) (emphasis added). Later, the ALJ stated that he accorded Dr. Das' opinion "partial weight," finding, in part, that the "evidence of record supports a finding that the claimant can perform a range of medium exertional activity **with no overhead reaching**" (Tr. 22) (emphasis added). Despite these statements, in the residual functional capacity ("RFC") assessment, the ALJ found that the plaintiff "can frequently, but not constantly, reach overhead with the left upper extremity" (Tr. 19). In addition to the ALJ's contradictory statements, nowhere in the decision does the ALJ specifically discuss his

18

reasons for rejecting the overhead reaching limitations that were outlined in Dr. Lehman's opinions (Tr. 380, 478-79) and agreed to by Dr. Schwartz (Tr. 532). This issue is particularly important as the vocational expert testified at the hearing that there would be no past work or any other medium work available if a limitation to no overhead reaching with the left upper extremity was added to the ALJ's hypothetical (Tr. 62).

"The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. Here, the undersigned finds that the ALJ "failed to provide a logical bridge between the evidence and his conclusion that [the plaintiff] was capable of the limitations included in [the RFC assessment]." *Roberts v. Saul*, C.A. No. 2:19-1836-BHH-MGB, 2020 WL 4370298, at *6 (D.S.C. July 15, 2020) (citing *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) ("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. The second component, the ALJ's logical explanation, is just as important as the other two.")), *R&R adopted by* 2020 WL 4369646 (D.S.C. July 30, 2020). Accordingly, this matter should be remanded to the ALJ for further consideration and evaluation of the medical opinions.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above**.**

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

September 28, 2020
Greenville, South Carolina

***The attention of the parties is directed to the important notice on the following page.***

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).